**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00381-CV**

_____

**IN THE INTEREST OF S.D.T. and S.D.T.**

**On Appeal from County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 23-10-15339-CV**

**MEMORANDUM OPINION**

Mother appeals an order terminating her parental rights to her minor children, Sally and Sam[1] (collectively "the children"). The trial court found, by clear and convincing evidence, that statutory grounds exist for termination of Mother's parental rights and that termination of her parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (N), (O), (2). In five issues, Mother challenges the legal and factual sufficiency of the evidence to support the

---

[1]To protect the identity of the children, we use pseudonyms to refer to the children and the parents. *See* Tex. R. App. P. 9.8(b)(2).

1

predicate grounds and the best interest finding, and complains that she received ineffective assistance of counsel.

As more fully discussed below, we affirm the trial court's Order of Termination as to Mother.

**Background and Facts Leading to Removal**

In March 2023, the Department of Family and Protective Services ("the Department") filed a petition to terminate Mother's parental rights to Sally and Sam.[2] The Department supported its petition with the affidavit of its investigator, Tameshia Copeland ("Copeland"). Copeland's affidavit set out the information leading to the children's removal.

According to Copeland's affidavit, the Department received an initial referral alleging the neglectful supervision of the children. Mother, Sally, and Sam were residing at the Crisis Center shelter (the "shelter"), and Sally and Sam were left unaccompanied after Mother was involuntarily admitted to a mental health facility. Mother stated that she was born in Ethiopia and was a pop star. Mother presented two different identities at the shelter and had no identification for Sally and Sam. Mother signed a childcare contract allowing an adult at the shelter to care for Sally and Sam; however, for legal reasons, the children could not remain at the facility.

---

[2]The alleged Father was included in the termination suit; however, he did not appeal the termination of his parental rights to Sally and Sam, and he is not a party to this appeal.

The Department contacted the relative who Mother listed as an emergency contact at the shelter. Mother's relative indicated that Mother stayed at her home for a few days, and then stayed at a motel before asking to be brought to the shelter. Mother's relative indicated that Mother has thought she was Megan Thee Stallion, Nicki Minaj, and others. Mother's relative further confirmed that she would like Sally and Sam to be placed with her; however, she was not an option after a review of her "CPI history and her criminal history." The Department contacted several other family members for possible placement, but none were willing to care for the children.

The Department contacted the facility were Mother was being treated and was informed that Mother was admitted under the name "Queen." Mother was not admitted under her legal name but under a different identity that she was claiming. Mother stated that her family members were in the United Kingdom, and she needed to contact the Royal family. Mother tried to contact two relatives to care for the children but neither answered the phone. Mother stated that she did not want her children in foster care and asked that they be transported to another relative for 24 to 72 hours. Mother would not give the Department permission to transport the children to her relative since her relative does not drive at night. The affidavit outlined many of Mother's other claims including that she was married to or involved with various rappers, she had thirty kids, and she was born blind and deaf.

3

The affidavit explained that Mother insisted her name was Queen and repeatedly denied her legal identity. Mother's relative informed the shelter that Mother was once on medication but has been off it for a while. The shelter later convinced Mother to go to Texana Behavioral Health Care Clinic ("Texana") for a medical checkup. During intake, Mother reiterated the same claims regarding her identity but began to "shut down" once she realized the visit was more about her mental health rather than a medical checkup. The therapist from the shelter accompanied Mother to Texana, and she informed the intake worker that Mother was fine with her children and that there were no concerns of her abusing or neglecting them. The therapist relayed that Mother did not exhibit violent or aggressive behavior. The therapist indicated there was a concern that Mother was incapable of taking care of the children once she left the shelter. It was determined at the end of the assessment that Mother should be admitted.

The investigator noted that she interviewed Mother at Sun Behavioral Hospital. During the interview, Mother claimed it all started when she was in college and received a call that Child Protective Services ("CPS") had her children. Mother said she sued the girl who had her kids and that she had to come from England to get verification from the judge. Mother relayed that President Trump, President Obama, and Congress had to get involved, that her name is Queen, and she is married to a rapper who adopted her children. Mother stated that she was married to Prince Harry

4

and that King Charles is the father of the children. Mother denied her legal name, claimed her social security number was stolen, and in addition to Sally and Sam, claimed that she is the mother of several royal family members. Mother stated that her mother died during childbirth, her dad works for the government, that she has a twin sister, that she was born deaf and blind, that she had a heart transplant, and then began talking about suing caseworkers and a judge and winning a settlement because she is also a judge.

The affidavit explained that Mother was brought to Sun Behavioral Hospital involuntarily by law enforcement, and Mother's drug tests were negative. As a result of Mother's hospitalization and the shelter being unable to keep the children, the Department took emergency custody before a court order on March 24, 2023.

The affidavit described Mother's prior CPS history. Her history included allegations of neglectful supervision, which were ruled out on four occasions, ruled "reason to believe" twice, and on one occasion the children were removed. Mother had four class B misdemeanor convictions for possession of marijuana, theft of property, and driving with an invalid license.

**Trial Evidence**

Officer Michael Moote

Officer Michael Moote ("Officer Moote") testified that he is a licensed peace officer with the Conroe Police Department. On July 2, 2024, while on patrol, Officer

5

Moote observed Mother make several traffic violations while operating a vehicle including unsafe lane changes and failure to use a turn signal. Mother was alone in the vehicle and did not have any government-issued identification, but provided hospital paperwork, hospital armband, and citation from the Livingston Police Department with an alias name. Through his investigation, Officer Moote determined that Mother was not the person identified in the documents she provided. Using a portable fingerprint scanner, Officer Moote was able to correctly identify Mother. He then arrested Mother for failing to identify and giving "false fictitious information." On cross-examination, Officer Moote explained that once her fingerprint was associated with a name, dispatch also provided a photo from either a Texas identification card or driver's license.

Officer Moote testified that it was very difficult to hold a conversation with Mother, as she rambled and made little sense. For example, Mother stated that she had a child every year since the age of five, and she continued to use the alias name even after Officer Moote determined her legal name.

Mother

Mother testified that her name was an alias, "Alyssa Michelle Stephens," which is not her legal name. Mother acknowledged that Sally and Sam are her children. Mother stated that she was the music artists Beyonce and Cardi B, and her appearance changes. Mother testified that she has been self-employed over fifteen

6

or twenty years working for RSDA Records writing books, music, and poems and making movies. She claimed to have made over a billion dollars last year. She understood that her children are in the Department's custody but denied leaving them unattended at the shelter. According to Mother, she left the children at a day care with the shelter's "day care lady," whose name she does not recall.

Mother acknowledged that the Department provided her with a service plan, and she claimed she completed the plan including being evaluated by a psychologist, although she could provide no documentation showing that. She did not have a residence, was living at a hotel, and claimed to have other properties in Texas. Mother denied ever using substances and denied ever being arrested for or pleading guilty to possession of a controlled substance. The State presented Mother's October 2023 Judgment of Conviction for possession of a controlled substance to the trial judge, showing she pled guilty for an offense that occurred on September 17, 2023.

When asked if she had seen the children more than once in the past year, Mother stated that she saw them several times but went into a coma. According to Mother, she was born blind, mute, and deaf, and had to go to a facility when she went blind. Mother testified she required therapy because she was raped. Mother also testified that she has bone cancer, breast cancer, and stomach cancer, and is receiving chemo treatments and was prescribed prescription marijuana. Mother acknowledged that it was important for someone with health or mental issues to

receive treatment to care for their children, and without treatment, it could be potentially dangerous for their children. Mother stated that she was sent to a facility to verify her birth name, age, and occupation, but she was then sent home. Mother denied needing help with her mental health.

For the two days before trial, Mother was renting a bed from someone at Studio 6 hotel in Conroe. Before that, she stayed at another hotel for nineteen days, and before that, she was in jail. Before jail, Mother said she lived between the Salvation Army and an address she did not know, although she claimed that as her residence.

On cross-examination, Mother stated that she was the children's sole provider from birth until the Department removed them. Mother testified that CPS came to her home looking for a female with the same first name as her legal name, and although CPS checked on the children they were not removed. According to Mother, the Department helped to get their birth certificates, music contracts, social security numbers, and helped the family relocate.

According to Mother, she went to the shelter and was sent to the hospital to get information, but she acknowledged that she did not go to the hospital voluntarily. Mother testified that she had an agreement with a lady in the shelter to watch the children while she was at the hospital. Mother stated that while at the shelter, no one questioned how she cared for the children. Mother believed she could take care of

the children but stated she needed help getting the proper documents regarding her finances. Mother reiterated that she completed everything that the Department asked of her.

Mother testified that in addition to Sally and Sam, her children are Princess Charlotte and others fathered by Prince Harry, Prince Charles, and rappers. She stated that she and her kids lived at "Kingston Palace." Mother also stated that she was not born black, but she darkened her skin color.

According to Mother, if a relative has the children, it is because the children's father gave them to her even though she is not a relative. Mother stated that if she felt the need to talk to a psychologist, then she would, but right now she is dealing with racial issues and "a lot of discrimination." Mother does not believe that she needs any mental health help right now.

Samantha Causey

Samantha Causey ("Causey") is an investigator with the Department, and she had been involved in Mother's case since May 2022, when she visited Mother and the children at an apartment. During that initial visit, Mother denied her legal name and provided an alias before threatening to call the police and file a restraining order on Causey. Once a police officer arrived, Causey "reengaged" with Mother over the phone, but Mother stated that the FBI was on her case, and she refused to meet with Causey without a police officer and her attorney.

Causey was eventually able to go inside Mother's home and as a result, Mother was detained so Causey could interview the children. Causey noted that the home was messy but had lights, utilities, and working appliances. The children were eating McDonald's on the floor. Throughout this time, Mother claimed to be Kate Middleton, Halle Berry, the mother of Prince Archie and Prince William, and that she is a member of the royal family. The children seemed okay, although Causey could not understand Sam's speech very well. Causey testified she was concerned about Mother's mental health because she did not seem to understand who she was and the impact it would have on the children. She explained that "the children were living in that environment with the mother on a daily basis and her mental health was influencing their daily lives." Causey noted that Mother believed and was telling the children they were royal family members, and Causey felt that could impact the children's mental health and development. Causey stated that leaving the children unattended at a shelter would be a concern and a reason for removal of the children by the Department.

Causey testified that she contacted Mother on two occasions, the children's general appearance was fine, and she did not observe marks or bruises on them. To Causey's knowledge, Mother was the children's sole caregiver. Causey did not have any concerns necessitating removal of the children. The children were four and five years old; they had clothes and food in the apartment but were not enrolled in school.

After her visit, Causey applied for court-ordered services with the Department, but it was denied.

Tawanna Anderson

Tawanna Anderson ("Anderson") was a caseworker assigned to Mother's case from October or November 2023 to June 2024. Anderson's review of Mother's file revealed Mother had not completed any assignments on her service plan, and Mother stated that she would talk to her attorney about the plan. Anderson testified that it was always difficult to contact Mother when requesting that she take a drug test, Mother always said to go through her attorney, and Anderson never received any of Mother's drug test results. Mother never provided information on where she was living or evidence she was working. While Anderson was the caseworker, the children were in foster care and there was no visitation between Mother and the children. Anderson explained that when she contacted Mother to schedule a visit, Mother requested a time approximately six weeks away, but was incarcerated before the visit occurred.

According to Anderson, Mother denied her legal name, which concerned her. Anderson believed Mother had mental health issues, which her service plan would have addressed, but Mother did not complete the plan. During Anderson's time as the caseworker, Mother did not demonstrate that she was able to provide the children a safe environment.

11

Anderson acknowledged that she never met Mother nor arranged to meet Mother outside of the courtroom. Anderson stated that although Mother did a psychological evaluation in another county, Mother did not complete any tasks while she was the caseworker. Anderson testified that Mother's phone was out of service at times, and she spoke with Mother to set up visitation with the children. In total, Anderson spoke with Mother twice in-person in the courtroom, never spoke to her over the phone, but she did exchange text messages with her. Anderson has never spoken with the alleged father and does not know who he is.

Maria Reza-Day

Maria Reza-Day ("Reza-Day") was the assigned caseworker on Mother's case from May to September 2023. Mother's family plan of service indicated that she was to participate in psychiatric services for her mental health and follow all recommendations of her doctor, including taking medications. Reza-Day testified that Mother completed a psychosocial evaluation through Heart to Heart, but that is not a psychological or psychiatric evaluation. The psychosocial evaluation was reviewed, and it stated that on the day Mother was evaluated, Mother "was floridly psychotic and would not be able to care for her children appropriately due to very poor reality testing." After her psychosocial evaluation, inpatient psychiatric care was recommended for Mother.

Based on the results, Reza-Day spoke with Mother about receiving inpatient treatment, and Mother said she would go on her own to Sun Behavioral. Reza-Day lost communication with Mother but when located, Mother stated that she did not go to Sun Behavioral because she did not have identification. Reza-Day located facilities that would take Mother but when contacted, Mother responded that she was sick. In later calls, Mother represented that she was sick or moving around. Reza-Day never received confirmation that Mother went to a psychiatric hospital, so Mother did not complete her service plan while she was the caseworker.

The plan also required that Mother complete a parenting class and take drug tests. Reza-Day never received a parenting class certificate from Mother, and although Mother was sent for drug tests, she did not appear for testing. The plan required that Mother complete a substance abuse assessment and individual counseling, but neither provider could contact her for scheduling. From May through September, Reza-Day was aware of Mother visiting the children twice. The notes from the visit indicate that Mother did not interact with the children much. Mother also refused visits in June and July, and did not participate in visits in August 2023. During Reza-Day's time on Mother's case, Mother stated that she lived in an apartment complex, a hotel, and that she was between homes.

Documents regarding Mother's initial permanency conference were presented to Reza-Day, and she did not dispute evidence that Mother participated in the initial

13

permanency conference. Reza-Day recalled that she met with Mother in Montgomery County to go over the tasks in the plan. Reza-Day did not receive an evaluation report from the physician that was appointed to conduct Mother's psychological or psychiatric evaluation, and she does not know if Mother had an evaluation. Reza-Day is not aware of Mother completing the substance abuse assessment, but she does not dispute any evidence that Mother went to an assessment. It was later clarified that the document regarding a drug screening was for a DNA test to determine maternity.

During Reza-Day's time on the case, Mother went by multiple names. She recalled Queen as one of the names and stated that Mother would get angry if called by her legal name. Also during her time, the children were placed with a relative in Montgomery County and doing well. Reza-Day did not know the father of the children.

Reza-Day believed that Mother had mental health issues because when they spoke, Mother would say she had record deals, she referred to her attorney as her immigration attorney, she continued to ask her attorney ad litem about her immigration, she said someone stole her identity, and she said that she was a record producer. She believed Mother had a substance abuse issue because Mother admitted to the use of marijuana. Reza-Day did not attempt to verify if Mother worked in the music industry or if she went to the police to obtain documents. During her time on

14

Mother's case, Reza-Day did not see evidence that Mother was able to care for the children, and she did not have stable housing, provide check stubs from employment, or have a driver's license or identification.

Cassie Beals

Cassie Beals ("Beals") has been the conservatorship caseworker on Mother's case since June 2024. Beals testified that she has not seen any evidence or reports of service that Mother has completed. Beals stated that since she has been on the case, Mother had only one visit with the children on August 20, 2024. According to Beals, she was concerned with some of Mother's statements to the children. Beals testified that Mother was adamant that the children know their real identities; she referred to them as Prince Sam and Princess Sally, and she told them that she was suing the Department for providing false documentation of their true royal titles. Mother also stated that the term Prince and Princess is on the children's birth certificate.

Beals stated that she feels termination is in the children's best interest given Mother's mental health and inability to provide a safe and stable home environment. Beals has no information regarding where Mother is living, and Mother has not provided Beals any pay stubs. Beals testified that the plan is to transition the children to an adoptive home.

Tamara Adams

Tamara Adams ("Adams") has been the CASA advocate on Mother's case since November 2023. Adams has visited the children and described Sally as "very girly" and "sweet," and Sam as a "sweet boy." Sally has some behavioral issues, such as food hoarding, that are being addressed in therapy.

Adams explained that a scheduled visit in July was cancelled because they learned that Mother was incarcerated on the day of the visit. Mother visited with the children on the Friday before trial, and Adams was concerned with what Mother said to the children. According to Adams, Mother told the children that she had houses in California, she was working to get their paperwork and birth certificates, and she planned to have them stay with her parents. Adams was concerned because Mother's statements were not true and could affect the children's reality and identity. Adams believes it is in the children's best interest to terminate Mother's parental rights and allow adoption because Mother is unable to care for them in a stable and safe environment.

Adams testified that she has had contact with Mother in court and by text and telephone. Adams said that she facilitated the first scheduled visit but has not talked with Mother about helping her with other services that CASA could provide. Other than Mother's comments to the children, her visit with the children was appropriate, and the children were excited to see her. Adams is unaware of the children's current

16

placement wanting to adopt either child. Placement of the children with their maternal grandmother is not an option because she is deceased, and Adams has not looked into placement of the children with another family. The children are no longer placed with a maternal great aunt because the great aunt was also raising Mother's other four children. Adams has no knowledge of Mother working and she does not know where Mother is living.

Adams believes it is in the children's best interest to terminate the parental rights of Mother and the father.

**The Termination Order**

After the bench trial, the trial court signed a final order terminating Mother's parental rights to the children. The trial court found that the Department had shown, by clear and convincing evidence, that it was in the children's best interest for Mother's parental rights to be terminated. *See id*. § 161.001(b)(2). The trial court also found that the Department had shown by clear and convincing evidence grounds for termination of Mother's parental rights under section 161.001(b)(1)(E), (N), (O). *See id*. § 161.001(b)(1)(E), (N), (O). The trial court found that Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; she constructively abandoned the children under section 161.001(b)(1)(N); and she failed to comply with the court-ordered service plan. *See id*.

Mother appealed the trial court's order and argued the evidence was legally and factually insufficient to support termination under sections 161.001(b)(1)(E), (N), (O), and (2). Mother further argues that she received ineffective assistance of counsel which resulted in an improper result.

**Standard of Review**

Termination of parental rights requires proof by clear and convincing evidence. *Id.* § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *see In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005) (citation omitted). The movant must show that the parent committed one or more predicate acts or omissions and that the termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have

18

disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266 (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d at 25). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (citation omitted). In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.). We defer to the factfinder's credibility determinations as long as they are not unreasonable. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

**Analysis**

Predicate Grounds

Mother challenges the sufficiency of the evidence supporting termination under section 161.001(b)(1)(E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

19

Under subsection (E), the Department had the burden to prove by clear and convincing evidence that Mother "engaged in conduct or knowingly placed the children with persons who engaged in conduct" that endangered their physical or emotional well-being. *Id.*

Generally, a parent's conduct that subjects a child to a life of uncertainty and instability has engaged in conduct that endangers their child's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345 n.4 (collecting cases). That said, proof of endangerment requires "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment[,]" yet "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citations omitted). Rather, endangering a child based on the parent's conduct means "'to expose a child to loss or injury'" or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Boyd*, 727 S.W.2d at 533). Importantly, the parent's endangering conduct need not occur in the child's presence, so conduct relevant to the factfinder's decision may include conduct that occurred before or after the child the subject of the Department's suit was born. *See J.O.A.*, 283 S.W.3d at 345; *In re B.P.*, No. 09-22-00031-CV, 2022 WL 2251739, at *9 (Tex. App.—Beaumont June 23, 2022, no pet.) (mem. op.). Generally, from evidence of a parent's past conduct showing the parent subjected a child to a life of

20

uncertainty and instability, a factfinder may infer that the parent will continue to engage in the conduct and the same conduct will endanger another child's physical and emotional safety and well-being. *See J.O.A.*, 283 S.W.3d at 345; *In re D.P.*, No. 09-22-00048-CV, 2022 WL 2975691, at *8 (Tex. App.—Beaumont July 28, 2022, pet. denied) (mem. op.).

A parent's mental instability may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *In re T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App.—Houston [1st Dist.] 2013, no pet.). A parent's mental illness or incompetence "alone are not grounds for terminating a parent-child relationship; however, if a parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can support termination under subsection E." *Id.* (citations omitted). Evidence of a parent's failure to comply with services to improve their mental health is a factor that the trial court can consider in determining whether a parent has engaged in a course of conduct that endangered the physical and emotional well-being of a child. *In re S.R.*, 452 S.W.3d 351, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A parent's untreated mental illness can expose a child to endangerment, because when a parent fails to take required medication, the parent can behave erratically and neglect the care of the child. *See In re P.H.*, 544 S.W.3d 850, 857–58 (Tex. App.—El Paso 2017, no pet.).

21

Here, the evidence shows that Mother and the children were staying at a shelter when Mother left the children unaccompanied while she was involuntarily admitted into a mental health facility. Mother's trial was around eighteen months after the Department became involved in Mother's case. Throughout that time, Mother did not have a permanent place to live and was never able to demonstrate employment with income. At the time of trial, Mother testified that she was renting a bed from someone at a hotel. Mother further testified that before the hotel where she is currently renting a bed, she lived at another hotel, the jail, and the Salvation Army. At trial, Mother also identified herself by an alias name that she had assumed, denied her legal name, stated that she is a famous musical artist such as Cardi B and Beyonce, and claimed that Princess Charlotte and others are her children, and her children were fathered by Prince Harry, Prince Charles, and rappers.

The evidence at trial further shows that Mother received a service plan from the Department, and at trial, Mother claimed that she completed the plan including being evaluated by a psychologist. However, two caseworkers testified at trial that Mother has not completed the service plan. Caseworker Anderson testified that Mother was unable to demonstrate that she was able to provide the children a safe environment and that although Mother did a psychological evaluation in another county, Mother did not complete any tasks while Anderson was the caseworker. Caseworker Reza-Day testified that Mother had a psychosocial evaluation by Dr.

Stadler, which differs from a psychological or psychiatric evaluation, and it specified that at the time of the evaluation, Mother was floridly psychotic and unable to care for the children. The evaluation further recommended that Mother receive inpatient psychiatric treatment for her mental health, and Mother has failed to do so despite Caseworker Reza-Day locating an available facility. Dr. Stadler further explained that Mother's delusions are very severe, Mother will probably not become stable quickly, and that Mother will likely have recurring episodes throughout her life.

The record also established that Sally was exhibiting problematic behaviors like food hoarding and was receiving treatment. Additionally, the record showed that multiple witnesses testified that Mother's erratic behavior in the children's presence and telling them things that had no basis in reality were a danger to their emotional mental health and development. Likewise, the record showed that Mother's untreated mental illness had led to arrests when she failed to provide accurate identifying information, which is another example of the instability she exposed her children to.

The trial court could have reasonably believed that Mother's abandonment of the children at the shelter without a caregiver endangered the children's physical and emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *J.O.A.*, 283 S.W.3d at 345; *M.C.*, 917 S.W.2d at 269; *Boyd*, 727 S.W.2d at 533; *In re D.P.*, 2022 WL 2975691, at *8; *In re T.G.R.-M.*, 404 S.W.3d at 14. At that time, Mother left the

23

children unaccompanied when she went to the hospital involuntarily because workers at the shelter were concerned about Mother's mental health. The evidence shows that the Department also had a concern about Mother's mental health and that at the time of trial, Mother still had not been mentally evaluated in accordance with the service plan or received any treatment. Mother's delusions and failure to receive treatment for her mental health can endanger the physical and emotional welfare of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *J.O.A.*, 283 S.W.3d at 345; *M.C.*, 917 S.W.2d at 269; *Boyd*, 727 S.W.2d at 533; *In re D.P.*, 2022 WL 2975691, at *8; *In re T.G.R.-M.*, 404 S.W.3d at 14. The evidence further showed that Mother does not have a residence or income to provide the children with a safe and stable environment.

Having determined that the evidence is legally and factually sufficient to support predicate endangerment findings under subsection (E), we need not address whether the evidence would also support the trial court's predicate findings of one or more of subsections (N) or (O), the remaining predicate findings that Mother challenged in her brief. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (explaining that a single predicate finding can support termination under prior version of statute); *In re G.M.S.*, No. 09-24-00207-CV, 2024 WL 4643302, at *8 (Tex. App.—Beaumont Oct. 31, 2024, pet. denied) (mem. op.) (explaining that if evidence is

24

sufficient to support single predicate finding under D or E, we need not address other predicate grounds). We overrule Mother's first issue.

Best Interest

Next, we address Mother's argument that the evidence is legally and factually insufficient to support the trial court's best interest finding. With respect to the child's best interest, there is a strong presumption that the best interest of a child is served by keeping the child with the parent. Tex. Fam. Code Ann. § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Even so, it is also presumed "the prompt and permanent placement of the child in a safe environment is…in the child's best interest." Tex. Fam. Code Ann. § 263.307(a).

In reviewing a parent's challenge to a best interest finding and when considering the non-exclusive factors outlined in *Holley v. Adams*, "courts focus on the best interest of the child, not the best interest of the parent." *In re H.M.R.J.*, No. 09-22-00171-CV, 2022 WL 17001955, at \*9 (Tex. App.—Beaumont Nov. 17, 2022, no pet.) (mem. op.) (citation omitted); *see Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Additionally, the Department is not required to present evidence addressing all the *Holley* factors. *See In re C.H.*, 89 S.W.3d at 27. The fact that the Department does not present evidence on some factors does not preclude the trier of fact from forming a strong belief or conviction that terminating the parent's

25

relationship with the child is in a child's best interest, particularly when the evidence is undisputed that the parent endangered the child. *See id.*

In a best interest analysis, the evidence supporting a trial court's subsection (E) finding may also support the trial court's best interest finding. *In re T.R.S.*, No. 09-18-00482-CV, 2019 WL 2455273, at *5 (Tex. App. —Beaumont June 13, 2019, no pet.) (mem. op.) (noting that the same evidence that supports a trial court's subsection (E) findings may be relevant to the trial court's best interest finding). A trial court's best interest finding may be based on direct or circumstantial evidence, or it may be based on subjective factors that the trial court may have observed in the trial. *Id.* at *4. When evaluating what is best for a child's future, trial courts may consider a parent's past conduct when that conduct is relevant to the child's best interest. *Id.* Ultimately, the question is whether the evidence when considered as a whole allowed the trial court to reasonably form a firm belief or conviction that it was in the children's best interest for the trial court to terminate Mother's parental relationship with Sally and Sam. *See In re C.H.*, 89 S.W.3d at 25, 27–28. The trial court was free to infer from the evidence that Mother's mental health issues were longstanding and persisted after the children were born. For example, the trial court heard testimony that Mother failed to obtain treatment for her mental health during the pendency of this case even though she was required to do so in the service plan. The plan also required that Mother be gainfully and fully employed, provide proof

26

to the Department of her finances, and obtain and maintain a safe and stable home environment.

When they testified, both the CASA advocate and a caseworker expressed concerns about whether the children would be safe were they placed in Mother's care considering Mother's untreated mental health. Mother provided the trial court with no evidence that she could provide the children a safe and stable home. The record shows that Mother is unemployed, has no permanent residence, and no evidence that she has been treated for her mental health issues.

"While parental rights are of constitutional magnitude, they are not absolute." *Id.* at 28. Given Mother's mental health history, the trial court could have reasonably formed a firm belief or conviction that terminating Mother's parental rights so that the children could be permanently placed in a safe home where their needs can be met is in their best interest. *See id.* at 27–28. We overrule Mother's fourth issue.

Ineffective Assistance

In her fifth issue, Mother complains that she received ineffective assistance of counsel when trial counsel failed to object to the timeliness of the adversary hearing that was continued four times. According to Mother, trial counsel not only failed to object to the timeliness of the adversary hearing, but also failed to file a mandamus. Mother argues that she was prejudiced by the errors committed by her trial counsel

such that the trial court either lost jurisdiction or the children should have been returned to Mother upon the expiration of the deadline.

Claims that trial counsel provide ineffective assistance in cases involving termination of parental rights are governed by the two-prong test stated in *Strickland v. Washington. See* 466 U.S. 668, 687 (1984); *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021); *In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003). Under the *Strickland* test, the complaining party must show: (1) counsel's performance was deficient, which means counsel made errors so egregious that they were not functioning as "'counsel'" guaranteed by the Sixth Amendment; and (2) counsel's deficient performance prejudiced the complaining party such that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different. *In re M.S.*, 115 S.W.3d at 545 (quoting *Strickland*, 466 U.S. at 687); *see also In re D.T.*, 625 S.W.3d at 73.

When evaluating trial counsel's performance, we indulge a strong presumption that counsel's conduct is within the wide range of reasonable, professional assistance, which includes trial strategy. *In re M.S.*, 115 S.W.3d at 545 (quoting *Strickland*, 466 U.S. at 689) (other citations omitted). An appellant has the burden to overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy. *Strickland*, 466 U.S. at 689 (citation omitted). If the record is silent about the reasons for counsel's actions, we

do not speculate to find ineffective assistance of counsel. *See In re A.S.*, No. 09-21-00142-CV, 2021 WL 5113817, at *11 (Tex. App.—Beaumont Nov. 4, 2021, pet. denied) (mem. op.); *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citation omitted). "Any claim of ineffective assistance must be firmly founded in the record and the record must affirmatively demonstrate the ineffectiveness." *In re S.M.T.*, 241 S.W.3d 650, 653 (Tex. App.—Beaumont 2007, no pet.) (citation omitted).

The trial court does not lose jurisdiction if it fails to timely conduct the adversary hearing. Instead, the remedy for the parents and the Department is to compel the trial court by mandamus to conduct the adversary hearing promptly. *In re J.M.C.*, 109 S.W.3d 591, 595 (Tex. App.—Fort Worth 2003, no pet.); *In re E.D.L.*, 105 S.W.3d 679, 687 (Tex. App.—Fort Worth 2003, pet. denied). Therefore, without addressing whether counsel acted competently, we hold that Mother failed to show she was prejudiced by counsel's failure to seek return of the children on the basis that there was no adversary hearing within the fourteen-day window.

The evidence also indicates that at the time the adversary hearing was extended, Mother claimed that another woman was the birth mother of the children. During the time of Mother's assertion, the trial court removed the attorney appointed for Mother and appointed an attorney to represent the alleged birth mother. The trial court then ordered genetic testing on both Mother and the alleged birth mother to

determine the maternity of the children. The genetic testing results indicated that Mother was the birth mother of the children. At the adversary hearing, the trial court found that Mother and the alleged birth mother are the same person. It is therefore reasonable to conclude that the extension and delay in conducting the adversary hearing was to determine the maternity of the children. We overrule Mother's fifth issue.

## Conclusion

Having overruled Mother's issues necessary to the appeal's disposition, we affirm the trial court's termination order.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on March 12, 2025
Opinion Delivered May 1, 2025

Before Golemon, C.J., Johnson and Wright, JJ.